**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN: 249203)
ak@kazlg.com
Gil Melili (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808

*Attorneys for Plaintiff Jessica Stock and Sofia Sioris*

**KELLER ROHRBACK L.L.P.**
Laura R. Gerber (*pro hac vice pending*)
lgerber@kellerrohrback.com
Derek Loeser (*pro hac vice* pending)
dloeser@kellerrohrback.com
Nathan L. Nanfelt (*pro hac vice pending*)
nnanfelt@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98122
Telephone: (206) 623-1900

*Attorneys for Plaintiffs Luke Hartsock and Jerry Winiarski*

**SAUDER | SCHELKOPF**
Joseph G. Sauder
jgs@sstriallawyers.com
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (610) 220-0580

*Attorney for Tracy Vincent*

UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JESSICA L. STOCK, SOFIA SIORIS, LUKE HARTSOCK, JERRY WINIARSKI, and TRACY VINCENT, Individually and On Behalf of All Others Similarly Situated,** | **Case No.:** 8:22-cv-00763-DOC-ADS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT:** |
| **Plaintiffs,**<br><br>**v.**<br><br>**WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.; and EARLY WARNING SERVICES, LLC D/B/A ZELLEPAY.COM,**<br><br>**Defendants.** | 1) **VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA"), 15 U.S.C §§ 1693, *ET SEQ.*;**<br>2) **VIOLATIONS OF THE CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**<br>3) **VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW § 49.30 *ET SEQ*;**<br>4) **VIOLATIONS OF THE ARIZONA CONUMER FRAUD ACT, ARIZ. REV. STAT. §§ 44-1521;**<br>5) **VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. §§ 501.201;**<br>6) **NEGLIGENCE; and**<br>7) **UNJUST ENRICHMENT.**<br><br>**JURY TRIAL DEMANDED** |

The plaintiffs Jessica L. Stock ("Ms. Stock" or "Plaintiff Stock"), Sofia Sioris ("Ms. Sioris" or "Plaintiff Sioris"), Luke Hartsock ("Mr. Hartsock" or "Plaintiff

Hartsock"), Jerry Winiarski ("Mr. Winiarski" or "Plaintiff Winiarski"), and Tracy Vincent ("Ms. Vincent" or "Plaintiff Vincent") bring this complaint, by and through their attorneys and on behalf of all others similarly situated, against Defendants Wells Fargo & Company ("WFC"); Wells Fargo Bank, N.A. ("Wells Fargo Bank"); and Early Warning Services, LLC d/b/a Zellepay.com ("Zelle") (collectively, "Defendants") and allege upon information and belief as follows:

INTRODUCTION

1.     Plaintiffs are victims of scams targeting individual customers of Wells Fargo Bank in connection with the Wells Fargo/Zelle mobile application, resulting in money being debited from Plaintiffs' respective bank accounts without Plaintiffs' authorization, in the amounts of $1,000 (Ms. Stock), $1,000 (Ms. Sioris), $7,500 (Mr. Hartsock), $1,500 (Mr. Winiarski), and $440 (Ms. Vincent).

2.     The Zelle scam is well-known to Defendants. Indeed, Wells Fargo Bank partially owns Zelle. However, Defendants have not taken appropriate steps to protect consumers from such scams which often results in losses of thousands of dollars to individual consumers and customers of Wells Fargo Bank.

3.     Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain to an individual Plaintiff, or to Plaintiffs' counsel, which Plaintiffs allege on personal knowledge.

4.     While many violations are described below with specificity, the Complaint alleges violations of each statute cited in its entirety.

5.     Unless otherwise indicated, the use of Defendants' names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendants, respectively.

6.     In enacting the Electronic Fund Transfer Act ("EFTA"), Congress found that the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers. 15 U.S.C. § 1693(a). However, due to the unique

characteristics of such systems, the application of existing consumer protection legislation was unclear during the time of its enactment, which left the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined. *Id.*

7.     That said, Congress's purpose in enacting the EFTA was to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id.* § 1693(b). However, "[t]he primary objective of [the EFTA] is the provision of individual consumer rights." *Id.*

8.     Plaintiffs file this lawsuit on behalf of themselves and other consumers to vindicate their rights, and because Plaintiffs should not be left "holding the bag" for unauthorized transactions Defendants are obligated to prevent and remedy.

**JURISDICTION AND VENUE**

9.     Original subject matter jurisdiction is valid in the U.S. District Court pursuant to 28 U.S.C. § 1331 because this case arises out of violations of federal law under the EFTA, 15 U.S.C. §§ 1693, *et seq*.  Jurisdiction of this Court arises pursuant to 28 U.S.C. §§ 1331 and 1367 for supplemental jurisdiction over the statutory and common law claims arising from the same or substantially similar transactions that form the basis of the EFTA claim.

10.     Moreover, the Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because (i) there is minimal diversity; (ii) Defendants are not government entities against whom the District Court may be foreclosed from ordering relief; (iii) there are more than one hundred (100) people in the putative classes; and (iv) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11.     This Court has personal jurisdiction over the Defendants because they do business in this District and intentionally availed themselves of the privilege of doing business within this District, and in doing so injured Plaintiff Stock and Plaintiff

Sioris, residents of this District, so as to render the exercise of jurisdiction by this Court just and proper.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because: (1) Defendants transact business within this judicial district and because Plaintiff Stock was a resident of Orange County, California at all times relevant to these claims and Plaintiff Sioris was a resident of the County of Los Angeles, California at all times relevant to these claims, such that a substantial part of the events giving rise to their causes of action against Defendants occurred while residing in this judicial district.

## PARTIES

13.     Plaintiff Stock is a natural person, individual citizen and resident of California, County of Orange, in this judicial district.

14.     Plaintiff Sioris is a natural person, individual citizen and resident of California, County of Los Angeles, in this judicial district.

15.     Plaintiff Hartsock is a natural person, individual citizen and resident of Seattle, Washington.

16.     Plaintiff Winiarski is a natural person, individual citizen and resident of Mesa, Arizona.

17.     Plaintiff Vincent is a natural person, individual citizen and resident of West Palm Beach, Florida.

18.     Upon information and belief, WFC is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in foreign countries.

19.     Upon information and belief, WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the

specific activities upon which the claims herein are based, and is the ultimate recipient of the unreimbursed transactions described herein.

20.     Plaintiffs are informed and believe, and thereon allege, that Wells Fargo Bank is, and at all times mentioned herein was, a national bank association chartered under the laws of the United States. Wells Fargo Bank provides WFC personal and commercial banking services and is WFC's principal subsidiary.

21.     Plaintiffs are informed and believe, and thereon allege, that Zelle is a limited liability company established under the laws of Delaware with its principal place of business in the State of Arizona.

22.     Upon information and belief, Zelle is a money payment platform ("MPP") that facilitates peer-to-peer ("P2P") instant payment services. Zells is owned by seven large banks in the United States, which includes WFC. Zelle saves participating banks money by minimizing the fees the banks are charged for competitor P2P payment transactions.

23.     Plaintiffs are informed and believe, and thereon allege, that Zelle makes money by facilitating payments with participating banks.

### BACKGROUND ON ZELLE SCAMS

24.     Created in 2017 by America's largest banks[1] to enable digital money transfers, Zelle comes embedded in banking apps and is now America's most widely used money transfer service, outpacing its closest rival (Venmo) by $260 billion in transfers in 2021.[2]

25.     During 2020, an estimated 18 million Americans were defrauded through P2P payment apps, including Zelle.[3]

---

[1] Bank of America, Capital One, JPMorgan Chase, PNC, Trust, U.S. Bank and Wells Fargo.

[2] https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last visited March 30, 2022).

[3] *Ibid*.

26.    It is free to sign up with Zelle, and Zelle is integrated into the websites and mobile app of Wells Fargo Bank.

27.    While Zelle provides an online link to what it calls a "User Agreement" on its website, at no time were the Plaintiffs made aware of this agreement.[4]

28.    Zelle users can send money to other registered Zelle users. They can also attempt to send money to unregistered recipients, in which case the unregistered recipient will receive an invitation to sign up for the service in order to complete the transaction. Users can access the Zelle network within Wells Fargo's website, through its mobile app, or through apps of other Zelle-participating financial institutions.

29.    Zelle advertises its money transfer services to consumers by claiming that it is "a fast, safe and easy way to send and receive money." It also urges consumers to use Zelle "to send money to friends and family, even if they bank somewhere different than you do."[5]

30.    Wells Fargo advertises Zelle as being "fast, safe, and convenient," and that "[a]ll you need to send money is an enrolled email address or U.S. mobile phone number and enrollment with Zelle® through Wells Fargo Online®."[6] For existing Wells Fargo customers who "use Wells Fargo Online or the Wells Fargo Mobile app[,]" per Wells Fargo, "[y]ou already have access to Zelle . . . at your fingertips."[7]

31.    The immediacy of Zelle's service has made it a favorite among consumers, but that immediacy has also made it a favorite among criminals, who can access

---

[4] Zelle encourages consumers to "pay it safe" by "look[ing] for Zelle in your banking     app[.]"     "How     to     Pay     it     Safe     with     Zelle," https://www.zellepay.com/financial-education/pay-it-safe (last accessed June 28, 2022).
[5] "Safely send money to friends and family, no matter where they bank." https://www.zellepay.com/how-it-works (last accessed July 5, 2022).
[6] *See* https://www.wellsfargo.com/online-banking/zelle/ (last visited July 5, 2022).
[7] *Ibid*.

bank accounts directly, which they cannot do with similar P2P platforms.[8] Once scammers can scare or trick their victims into sending money via Zelle, "they can siphon away thousands of dollars in seconds."[9]

32.     Zelle and Banks, including Wells Fargo, are aware of the widespread fraud through Zelle but are doing virtually nothing to stop it and doing little to nothing to help consumers get their money back.[10]

33.     Nowhere in Defendants' marketing do they warn potential Zelle users of the risks of being scammed by persons impersonating their banks. Consumers are not aware that transactions with Wells Fargo/Zelle differ from other similar platforms.

34.     In one instance involving a consumer who called Wells Fargo's customer service line to report losing $500.00 because of a Zelle scam, the customer service representative indicated that "'[a] lot of people are getting scammed on Zelle this way'" and that "[g]etting ripped off for $500 was 'actually really good,' . . . because 'many people were getting hit for thousands of dollars.'"[11]

35.     Zelle and the banks that own Zelle are aware of the widespread fraud through Zelle but are doing virtually nothing to stop it and doing little to help consumers get their money back.[12]

36.     Defendants are keenly aware of these scams, but have not done little to educate consumers about the risks of using Zelle,[13] a payment service in which Defendants have a financial interest.

---

[8] *See* Footnote 4, *supra.*

[9] Stacey Cowley and Lananh Nguyen, "Fraud is Flourishing on Zelle. The Banks Say It's Not Their Problem." N.Y. Times (March 6, 2022) https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

[10] *Ibid.*

[11] *Ibid.*

[12] *Ibid.*

[13] *Ibid.*

37.     On information and belief, Wells Fargo Bank and WFC use Zelle, which they own, to insulate themselves from financial liability for unauthorized transactions.

38.     Recent Consumer Financial Protection Bureau guidance on unauthorized Electronic Funds Transfers ("EFTs") indicates P2P payments are EFTs, such as transactions made with Zelle, and trigger "error resolution obligations" to consumers to protect them from situations where they are fraudulently induced and requested by a third party to provide their account information that results in authorized debits from their accounts.[14]

39.     Additionally, the Federal Deposit Insurance Corporation ("FDIC") issued a report in March 2022 finding that Regulation E's "liability protections for unauthorized transfers apply even if a consumer is deceived into giving someone their authorization credentials."[15] Further, the FDIC stated that "[c]onsumer account disclosures cannot limit protections provided for in the regulation."[16] The FDIC stated that both the banks and MPPs are considered "financial institutions" under Regulation E, and as such have investigative and error resolution obligations under Regulation E.[17]

40.     Even so, Defendants have not reversed or refunded all funds of Plaintiffs' disputed and unauthorized transactions (including any related overdraft fees or account charges that were incurred as a result of these unauthorized transactions), though obligated to do so.

---

[14] "Electronic Fund Transfers FAQs," Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#financial-institutions-2 (last updated December 13, 2021).

[15] "Consumer Compliance Supervisory Highlights Federal Deposit Insurance Corporation," (March 2022), https://www.fdic.gov/regulations/examinations/consumer-compliance-supervisory-highlights/documents/ccs-highlights-march2022.pdf.

[16] *Id.*

[17] Id.

41.     On information and belief, Wells Fargo Bank does not reimburse consumers for losses from unauthorized EFTs due to fraud, even where the losses are timely reported by consumers to Wells Fargo Bank.

42.     On information and belief, as part of its normal business practice, Wells Fargo Bank informs Zelle of disputed customer transactions involving the Zelle mobile application and the Zelle feature on Wells Fargo Bank's mobile banking application.

43.     On information and belief, Wells Fargo Bank has notified Zelle of each loss sustained by each of the plaintiffs and the putative class members. Plaintiff Vincent notified Zelle of her loss. On information and belief, Zelle has not investigated any of the unauthorized EFTs, has not complied with its "error resolution" obligations, and has failed to reimburse any of the unauthorized EFTs.

PLAINTIFFS' FACTUAL ALLEGATIONS

44.     Plaintiffs are victims of sophisticated scams where scammers mimicked Wells Fargo Bank's identity, as well as the means of communication typically used by Wells Fargo Bank to communicate with customers in the event of actual fraud.

45.     Plaintiffs' cellular telephone numbers and use of Wells Fargo Bank and WFC banking services and Zelle are nonpublic personal information.

***Plaintiff Stock***

46.     On or about December 28, 2021, Plaintiff Stock received a call on her cellular telephone from a phone number with a Caller ID from Wells Fargo.

47.     When Plaintiff Stock answered the phone, a man purporting to be one of Wells Fargo's customer service representatives indicated that he was calling Plaintiff to review suspicious transactions on Plaintiff's account.

48.     Since all the transactions that the purported representative reviewed with Plaintiff Stock were made in retail locations located in Florida, they were unrecognizable to Plaintiff Stock, who resides in Orange County, California.

49.     As such, Plaintiff Stock told the purported representative that she did not

1  recognize any of those transactions.

2  50.   In response, the purported Wells Fargo representative instructed Plaintiff

3  Stock to login to her online account so that he could assist Plaintiff with the

4  suspicious transactions.

5  51.   After Plaintiff Stock logged into her Wells Fargo account, she discovered

6  that none of the charges mentioned by the purported representative were appearing

7  on her account.

8  52.   After Plaintiff Stock had indicated that the suspicious transactions were not

9  appearing on her account, the purported representative told Plaintiff that he had

10  already removed those transactions from her account.

11  53.   The purported representative informed Plaintiff Stock that someone had used

12  the Zelle function in the Wells Fargo smartphone application to conduct the

13  suspicious transactions on Plaintiff's account. At that point, the purported

14  representative instructed Plaintiff to set up the Zelle function on Plaintiff Stock's

15  Wells Fargo smartphone application to intercept any funds that were susceptible of

16  being lost as a result of the suspicious transactions on Plaintiff Stock's account.

17  54.   After Plaintiff Stock raised some concerns, the purported representative

18  reassured Plaintiff Stock that the only way for her to retrieve her funds instantly

19  was to set up the Zelle function and follow the purported representative's

20  instructions.

21  55.   After receiving the purported representative's reassurance, Plaintiff Stock set

22  up the Zelle function on her Wells Fargo smartphone application. As part of the

23  process in setting up this function, Plaintiff Stock was required to send the purported

24  Wells Fargo representative a code.

25  56.   Once Plaintiff Stock sent the purported representative the above-mentioned

26  code, Plaintiff Stock was informed that she would see any missing funds back in

27  her account within a few hours.

28  57.   The actual Wells Fargo Bank sent to Plaintiff Stock's cellular telephone via

text message, a "Verification code" that Plaintiff Stock was directed to use to sign into her Wells Fargo account to verify her mobile number within 24 hours, which text message did not provide any caution to Plaintiff Stock not to share the code with others.

58.    Plaintiff Stock's transaction with the purported Wells Fargo representative resulted in $1,000.00[18] being taken from Plaintiff's checking account with Wells Fargo.

59.    Plaintiff Stock informed the purported representative that she was going to change her Wells Fargo online banking account password as soon as she ended the call. In response to this assertion, the purported representative told Plaintiff Stock that he would call back within a few days to assist Plaintiff Stock in changing her password.

60.    At this point, Plaintiff Stock immediately hung up the phone and proceeded to change her Wells Fargo online banking password because she realized that she had just been scammed and that the purported Wells Fargo representative was in fact a scammer.

61.    Immediately after realizing that she had been scammed that same day, Plaintiff Stock disputed the Zelle transaction with Wells Fargo whereby the $1,000.00 was withdrawn as a result of the scam.

62.    In disputing the transaction, an actual Wells Fargo representative informed Plaintiff Stock that she had been scammed and that several other customers had called Wells Fargo that day about a similar scam. When she asked about the likelihood of the transaction being reversed due to the scam, the Wells Fargo representative told Plaintiff Stock that the likelihood was "high."

63.    A few days after her first phone call with the purported Wells Fargo

---

[18] Initially, an attempt was made to transfer $2,000 through the Zelle mobile application, but only $1,000 was ultimately transferred because there were insufficient funds to transfer $2,000.

representative, Plaintiff Stock received yet another call from the same purported Wells Fargo representative with the same Caller ID, who indicated that he was calling from Wells Fargo. This time, the purported representative indicating that he was calling Plaintiff Stock in order to assist her in setting up a new password for her Wells Fargo online banking account.

64.     Fearful of being scammed once again, and not knowing for certain whether the caller was from Wells Fargo Bank, Plaintiff Stock hung up the telephone call.

65.     On December 31, 2021, Wells Fargo Bank issued a provisional credit on Plaintiff's account for the disputed amount.

66.     However, a letter dated February 10, 2022 that was sent to Plaintiff Stock at her residential address at the time in Orange County, California, from Wells Fargo's Online Fraud Claims department, indicated that the bank had completed its investigation into Plaintiff Stock's dispute and concluded that it would reverse the provisional credit within ten (10) days because the disputed transaction was "made by [Plaintiff] or someone who had [Plaintiff's] permission to perform transactions on [her] account."

67.     On February 24, 2022, Wells Fargo Bank reversed the provisional credit in the amount of $1,000, despite having been aware of the Zelle scam months prior to the unauthorized transaction affecting Plaintiff.

68.     On March 7, 2022, which was after Plaintiff Stock filed the Complaint in this action, Wells Fargo Bank charged Plaintiff Stock a monthly service fee of $10.00, since Plaintiff Stock did not have $1,000 in her account when Wells Fargo Bank reversed the provisional credit.

69.     Thereafter, Plaintiff Stock received another written correspondence dated April 6, 2022, from Wells Fargo's Online Fraud Claims department to Plaintiff Stock at her then residential address in Orange County, California, indicating that Plaintiff Stock's Zelle claim had been reviewed again, and "as a courtesy to you, we have credited $1,000.00 to your account . . .Please consider your claim closed."

70.   On or about April 7, 2022, which was also after Plaintiff Stock filed the Complaint in this action, Wells Fargo Bank credited Plaintiff Stock $1,000 to her account. However, that same day, Plaintiff Stock was charged a second a $10.00 monthly service fee.

71.   A few days later, Plaintiff Stock received three separate written correspondences to her current residential address in Orange County, California dated April 13, 2022.

72.   One of the April 13, 2022 letters indicated that Wells Fargo Bank has "determined that [the disputed Zelle] payment was processed as requested" and another letter stated that Wells Fargo Bank will be "debiting the provisional credit in the amount of $1,000.00 that was provided to you."

73.   These conflicting correspondences from Wells Fargo Bank during April of 2022 left Plaintiff Stock confused and unsure if the $1,000 credit would again be reversed by Wells Fargo Bank.

74.   Upon information and belief, all Defendants were well-aware of the Zelle scam of Plaintiff Stock prior to December 28, 2021, yet took virtually no steps to protect Plaintiff Stock or other similarly situated consumers, due in part to Defendants' own financial interests.

75.   As of the date of filing this First Amended Complaint, Plaintiff Stock has not been refunded for the two $10.00 account fees.

***Plaintiff Sioris***

76.   On or about March 17, 2022, at approximately 3:00 p.m., Plaintiff Sioris received a text message on her cellular telephone from a phone number with a Caller ID appearing to come from Wells Fargo regarding a pending Zelle transaction.

77.   Simultaneously, Plaintiff also received an email from what appeared to be Wells Fargo requesting that she click a link and fill out a form to resolve the issue with the Zelle transaction.

78.   Shortly thereafter, at about 3:07 p.m., Plaintiff Sioris received an email from

what Plaintiff Sioris believed to be Zelle from the email address zelle@servicessuport.com with the subject line "Processing your funds."

79.    This email stated, "We encountered a little problem while crediting your Zelle account, and you have a pending payment of $1500.00 USD but we have a problem crediting your Zelle account with that amount because your Zelle account reached limited and cannot receive the above $1000.00 USD."

80.    The email further stated to "READ AND FOLLOW EVERY INSTRUCTIONS CAREFULLY TO GET YOUR BALANCE CREDIT INSTANTLY."

81.    Reasonably believing that the text message and email were from Wells Fargo and Zelle, Plaintiff clicked the link in the email and filled out the requested information.

82.    About an hour or so later, at approximately 3:58 p.m., Plaintiff Sioris received two emails from Wells Fargo Online bearing the email address alerts@notify.wellsfargo.com. The first email indicated that a new recipient was added to Plaintiff Sioris' Zelle account, and the second email was a transaction receipt from Wells Fargo showing that $1,000.00 was transferred from Plaintiff Sioris' savings account to an unknown recipient.

83.    Plaintiff Sioris did not add the unknown recipient of the $1,000.00 transfer to her Zelle account, nor did she authorize or knowingly make this transfer.

84.    Plaintiff Sioris immediately disputed the $1,000.00 charge that same day by calling Wells Fargo to report the fraudulent Zelle transfer.

85.    The next day, Wells Fargo closed the savings account of Plaintiff Sioris that was the subject of the fraudulent charge and opened a new account savings account with a new account number. This account transfer was confirmed by an email correspondence from Wells Fargo that was sent to Plaintiff Sioris on March 18, 2022 at 2:37 a.m.

86.    Plaintiff Sioris then received a written communication to her residential

address in Los Angeles, California from Wells Fargo's Claims Assistance Center for Online Fraud Claims dated March 20, 2022. This letter stated, "We have researched your inquiry and determined that the unauthorized activity you reported was initiated from within the online banking profile belonging to the joint signer for this account. . . Based on the reason(s) stated above, we respectfully deny your claim."

87.     Plaintiff Sioris continued to attempt to dispute the fraudulent charge, but Wells Fargo denied her claim again in June of 2022.

88.     Plaintiff Sioris received another written communication to her residential address in Los Angeles, California from Wells Fargo dated June 3, 2022. This letter again indicated Wells Fargo "denied [Plaintiff Sioris'] claim since the transaction processed correctly."

89.     Upon information and belief, all Defendants were well-aware of the Zelle scam of Plaintiff Sioris prior to March 17, 2022, yet took virtually no steps to protect Plaintiff Sioris or other similarly situated consumers, due in part to Defendants' own financial interests.

90.     As of July 6, 2022, Plaintiff Sioris has not been refunded for the $1,000.00 fraudulent charge.

***Plaintiff Hartsock***

91.     On or about December 23, 2021, Plaintiff Hartsock received a text message on his mobile phone informing him that there were unauthorized transactions on his Wells Fargo Bank account and that he should reply "yes" if he wanted to receive a call about it from Wells Fargo Bank.

92.     Soon after responding "yes" to that text message, Plaintiff Hartsock received a phone call on his same mobile phone from a phone number identified on his Caller ID as Wells Fargo Bank.

93.     Plaintiff Hartsock answered the phone, and a person purporting to be a customer service representative from the Wells Fargo Bank Fraud Department

indicated that she was calling Plaintiff Hartsock to confirm possible suspicious transactions on Plaintiff Hartsock's Wells Fargo Bank account.

94.   The purported representative instructed Plaintiff Hartsock that he needed to use the Wells Fargo app, and its Zelle function specifically, to delete and then re-add and pay himself as a Zelle payee. By doing so, she said, this would confirm his identity and lock out the scammer from accessing his Wells Fargo Bank account.

95.   During this process, Wells Fargo Bank sent Plaintiff Hartsock's cellphone a "Verification code" text message that the purported representative fraudulently induced Plaintiff Hartsock to confirm with her as a means for Plaintiff Hartsock to re-add himself as a payee to his Wells Fargo Bank account. She stated that the funds would "clear" and show in Plaintiff Hartsock's account in the next 24 hours.

96.   Plaintiff Hartsock's telephonic interaction with the purported Wells Fargo Bank representative and use of the Wells Fargo/Zelle app resulted in $3,500 being sent via Zelle "to himself." In reality, on December 23, 2021, scammers sent money from Plaintiff Hartsock's Wells Fargo Bank account via Zelle to the scammers' accounts—accounts unknown to Plaintiff Hartsock.

97.   Plaintiff Hartsock did not authorize an EFT from his Wells Fargo Bank account on December 23, 2021.

98.   Plaintiff Hartsock was fraudulently induced by a purported Wells Fargo representative to share a Wells Fargo Bank verification code, which resulted in transfer of funds via Zelle out of Plaintiff Hartsock's Wells Fargo Bank account.

99.   On December 24, 2021, Plaintiff Hartsock was again informed by text message from the same phone number from the day prior that there were additional unauthorized transactions on his Wells Fargo Bank account and that he should reply "yes" if he wanted to receive a call about from Wells Fargo Bank.

100.   In a second telephonic interaction, on December 24, 2021, Plaintiff Hartsock again received a call on his cellphone from a phone number identified on his Caller ID as Wells Fargo Bank.  Plaintiff Hartsock immediately raised concerns about the

identity of the purported representative from Wells Fargo Bank. The purported Wells Fargo Bank representative told Plaintiff Hartsock that deleting and then re-adding himself as a payee was the only means to stop the unauthorized transactions and get his money back.

101.   Plaintiff Hartsock's second telephonic interaction with the purported Wells Fargo representative, again using the Wells Fargo/Zelle app, resulted in $4,000.00 being sent via Zelle "to himself" in multiple transactions. In reality, on December 24, 2021, scammers sent money from Plaintiff Hartsock's Wells Fargo Bank accounts via Zelle to the scammers' accounts—accounts unknown to Plaintiff Hartsock.

102.   Plaintiff Hartsock did not authorize EFTs from his Wells Fargo Bank accounts on December 24, 2021. Plaintiff Hartsock was induced by a purported Wells Fargo representative to share the Zelle verification codes, which resulted in the transfer of funds via Zelle out of Plaintiff Hartsock's Wells Fargo Bank accounts.

103.   After Plaintiff Hartsock realized that he had been scammed, Plaintiff Hartsock disputed the transactions with Wells Fargo Bank as soon as possible, after the Christmas holiday and weekend, on December 27th and again on December 28th and December 30th. Plaintiff Hartsock spent multiple hours on the phone with Wells Fargo Bank and was given inconsistent responses to the fraud Plaintiff Hartsock was attempting to report.

104.   In disputing the transactions, an actual Wells Fargo Bank representative informed Plaintiff Hartsock that he had been scammed and confirmed that other customers had called with similar concerns. The first Wells Fargo Bank representative whom Plaintiff Hartsock spoke to said that the likelihood of the transactions being reversed due to the fraudulent conduct of the scammers was high.

105.   In a subsequent call, Wells Fargo Bank representatives informed Plaintiff Hartsock that Wells Fargo Bank would investigate the disputed transactions. But in

later conversations, Wells Fargo Bank indicated that it was less likely that the funds would be refunded.

106.   By January 5, 2022, Wells Fargo Bank stated that it had completed its investigations, and informed Plaintiff Hartsock that it was refusing to refund Plaintiff Hartsock for any of the unauthorized transactions.

107.   On April 8, 2022, Wells Fargo Bank changed its position as to the December 23, 2021 disputed transaction only, informing Plaintiff Hartsock of its decision to credit $3,500 back to Plaintiff Hartsock's Wells Fargo Bank account.

108.   Defendants knew or should have known of the likelihood of this type of scam and its financial detriment to consumers, including Plaintiff Hartsock.

109.   For each unauthorized transaction, Wells Fargo Bank sent Plaintiff Hartsock two form letters, identical in substance. The letters were all sent within a day or two of each other.

110.   One letter states:

> Based on the information available to us, we [Wells Fargo Bank] have determined that this payment was processed as requested.   As a courtesy, we will continue to attempt to assist with resolution of this issue with the receiving financial institution. We will notify you by U.S. mail to update you of our findings.

111.   The second letter states:

> Our records indicate that you initiated a Zelle Transfer through your Wells Fargo Online banking session on 12/23/2021 [or 12/24/2021] in the amount of . . .
>
> As this transfer has already been approved and processed, we are unable to stop or reverse the funds . . .
>
> We hope this information has been helpful to you[.]

112.   The information was, in fact, *not* helpful to Plaintiff Hartsock.

113.   Wells Fargo Bank letters also informed Plaintiff Hartsock that Wells Fargo Bank "notified the financial institution and the Zelle Network about the scam."

114.   Plaintiff Hartsock has not received any reimbursement or communications from Zelle about the fraudulent transactions.

115.   Defendants were well-aware of the Zelle scam prior to December of 2021, yet took virtually no steps to protect consumers, or to help scammed consumers, due to Defendants' own financial interests.[19]

116.   Plaintiff Hartsock's Wells Fargo Bank checking account had a deficit of $4,000.00 until June 7, 2022, when, without explanation, Wells Fargo Bank partially reversed $3,500 of the unauthorized transactions.

### *Plaintiff Winiarski*

117.   Plaintiff Winiarski is a Wells Fargo Bank customer of several years.

118.   On March 19, 2022 Plaintiff Winiarski completed a rental application for a residence in San Tan Valley, Arizona. Plaintiff Winiarski submitted a $75.00 application fee via Venmo to a scammer purporting to be the owner of the actual residence.

119.   The scammer sent Plaintiff Winiarski Letter of Approval to Rent, and Plaintiff Winiarski signed a formal lease contract via DocuSign.

120.   Per terms of the lease contract, Plaintiff Winiarski provided the "landlord" with the first month's rent of $1,500.00. The scammer requested that the money be sent via Zelle and provided an email address.

121.    In anticipation of an April 1 start for the "approved" residential lease, on March 20, 2022, Plaintiff Winiarski sent from his Wells Fargo Bank account $1,500 via Zelle.

122.   The next day, March 21, 2022 at 6:26 am, the scammer texted Plaintiff Winiarki. The scammer told Plaintiff Winiarski that the $1,500 payment was "reversed and sent back to you [Plaintiff Winiarski]." The scammer included a

---

[19] *Ibid*.

screen shot, pictured below, of the scammer's Zelle account showing reversal of the funds.



123.   Within hours, Plaintiff Winiarski called Wells Fargo Bank to ascertain what had happened to the funds. Per Wells Fargo Bank, the deposit funds had already cleared and had been deposited the recipient's account.

124.   Based on that information, Plaintiff Winiarski concluded that he had been the victim of a scam.

125.   Plaintiff Winiarski filed a police report with Pinal County Sheriff's Office.

126.   Plaintiff Winiarski made fraud claims with Wells Fargo Bank for both the $75.00 Venmo transaction and $1,500 Zelle transaction. On March 25, 2022 Plaintiff Winiarski provided supplemental documentation, including screen shots of the text messages with the scammer and documentation of the transactions. He also provided the assigned police officer's contact information.

127.   On information and belief, Wells Fargo Bank did not contact the assigned police officer and made no further investigation of Plaintiff Winiarski's claims.  By letter of June 9, 2022, Wells Fargo Bank informed Plaintiff Winiarski that its investigation was closed.

128.   Venmo reversed and refunded $75.00 to Plaintiff Winiarski.

129.   Wells Fargo Bank and Zelle refused to reverse or refund $1,500 to Plaintiff

Winiarski.

130.   Plaintiff Winiarski, through an attorney, corresponded with Zelle on May 10, 2022 about the facts surrounding his financial injury.

131.   By letter of May 20, 2022, Zelle maintained that Zelle is "in no way responsible for the transaction" and is "not in a position to recover the funds[,]" because Zelle "does not have any account, or other, [*sic*] relationship with Mr. Winiarski." Zelle directed Plaintiff Winiarski to "continuing working [*sic*] with his financial institution for assistance."

### *Plaintiff Vincent*

132.   Plaintiff Vincent maintains a personal Wells Fargo bank account and accesses her account through the Wells Fargo mobile banking app.

133.   On or about May 9, 2022, Plaintiff Vincent tried to use Zelle to transfer money and it did not work. Plaintiff Vincent followed up by calling Wells Fargo and the phone call was disconnected.



134.   Shortly thereafter, a scammer, disguised as a Wells Fargo Bank representative called Plaintiff Vincent back. The scammer said that he was calling from Wells Fargo Technical Support and requested access to Plaintiff Vincent's accounts in

order to resolve the problem. Plaintiff Vincent observed that the incoming call did not come from a 1-800 number typically used by Wells Fargo and inquired why that was. The scammer impersonating Wells Fargo Technical Support brushed aside her concern and continued to remote into her account. He indicated that he needed to look through her account to test withdraw $1. Instead, he entered in a name and email of "Megan Lowelli" and instead withdrew $440 from Plaintiff Vincent's account.

135.   Later on May 9, 2022, the scammer tried to take an additional $5,000, which was blocked because Plaintiff Vincent rejected the withdrawal as unauthorized. The scammer then sought to take $350. This too was blocked and rejected.

136.   The same day, May 9, 2022, Plaintiff Vincent called Zelle to file a claim of fraud. A Zelle representative told Plaintiff Vincent that Zelle could not help her and that she should go through Wells Fargo.

137.   Later that day, May 9, 2022, Plaintiff Vincent contacted Wells Fargo to file a fraud claim. Plaintiff Vincent has since contacted Wells Fargo weekly and Wells Fargo representatives have told her that they have completed their investigation and her case has been closed. Despite timely reporting the fraud and unauthorized transaction, Plaintiff Vincent has not received back the $440 that was taken from her account.

138.   On June 27, 2022, Plaintiff Vincent received a letter from Wells Fargo's Claims Assistance Center. In the letter Wells Fargo admitted that it was aware of the fraud but refused to refund Plaintiff Vincent her money, stating, "We couldn't reverse the online transfer….Your claim is now closed."

139.   No further response has been received from Defendants.

## CLASS ALLEGATIONS

140.   Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

141.   Plaintiffs are members of and seek to represent a nationwide Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), defined as:

> All persons within the United States whose bank account with Wells Fargo was debited via one or more transactions using the Wells Fargo and/or Zelle mobile application that was not permanently credited by Defendant/s in full within 45 days of a dispute by the customer and/or the consumer's authorized representative concerning the transaction(s).

142.   Additionally, Plaintiff Stock and Plaintiff Sioris are members of and seek to represent a California Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), defined as:

> All persons residing in California whose bank account with Wells Fargo was debited via one or more transactions using the Wells Fargo and/or Zelle mobile application that was not permanently credited by Defendant/s in full within 45 days of a dispute by the customer and/or the consumer's authorized representative concerning the transaction(s).

143.   Additionally, Plaintiff Hartsock is a member of and seeks to represent a Washington Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2), and/or (b)(3), defined as:

> All persons residing in Washington whose bank account with Wells Fargo was debited via one or more transactions using the Wells Fargo and/or Zelle mobile application that was not permanently credited by Defendant/s in full within 45 days of a dispute by the customer and/or the consumer's authorized representative concerning the transaction(s).

144.   Additionally, Plaintiff Winiarksi is a member of and seeks to represent an Arizona Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2), and/or (b)(3), defined as:

> All persons residing in Arizona whose bank account with Wells Fargo was debited via one or more transactions using the Wells Fargo and/or Zelle mobile application that was not permanently credited by Defendant/s in full within 45 days of a dispute by the customer and/or the consumer's authorized representative concerning the transaction(s).

145.   Additionally, Plaintiff Vincent is a member of and seeks to represent a Florida Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), defined as:

> All persons residing in Florida whose bank account with Wells Fargo was debited via one or more transactions using the Wells Fargo and/or Zelle mobile application that was not permanently credited by Defendant/s in full within 45 days of a dispute by the customer and/or the consumer's authorized representative concerning the transaction(s).

146.   Excluded from the Class and Sub-Classes are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Further excluded from the Class and Sub-Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

147.   Plaintiffs reserve the right to modify the proposed class definitions, including but not limited to expanding the class to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

148.   The proposed Class and Sub-Classes meet the criteria for certification under Rule 23(a), b(2) and b(3).

149.   Numerosity: The members of the Class and Sub-Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class and Sub-Classes consists of thousands of individuals nationwide.

150.   Commonality: There are questions of law and fact common to the Class and Sub-Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

A.     Whether Plaintiffs and the Class Members lost money that was transferred from their account via Zelle;

B.     Whether Plaintiffs and the Class Members were customers of Wells Fargo at the time of the unauthorized transactions;

C.     Whether Plaintiffs and the Class Members were customers of Zelle at the time of the unauthorized transactions;

D.     Whether Defendants violated EFTA by failing to adequately investigate the disputes of Plaintiff and the Class Members;

E.     Whether Defendants violated EFTA by failing to correct errors on the accounts of Plaintiffs and the  Class Members within 45 days of the transactions being disputed;

F.     Whether the transactions at issue were unauthorized EFTs, by way of a third party fraudulently obtaining access to Plaintiffs' and the Class Members' accounts through fraudulent inducement, making them errors subject to EFTA's remedial provisions, including Regulation E;

G.     Whether Plaintiffs and the Class Members are entitled to maximum statutory damages, costs and fees under EFTA;

H.     California Sub-Class: Whether the conduct of Wells Fargo Bank and WFC was "unlawful" as that term is defined in the UCL;

I.     California Sub-Class: Whether the conduct of Wells Fargo Bank and WFC was "unfair" as that term is defined in the UCL;

J.     Washington Sub-Class: Whether the conduct of Defendants was an "unfair or deceptive act[] or practice[]" as that term is defined in the Washington Consumer Protection Act, RCW § 19.86 *et seq.*;

K.      Whether Plaintiff Hartsock and the Washington Sub-Class are entitled to maximum statutory damages, costs, and fees under the Washington Consumer Protection Act;

L.      Arizona Sub-Class: Whether the conduct of Defendants constitutes a "deceptive or unfair act or practice … in connection with the sale or advertisement of any merchandise" as defined by Ariz. Rev. Stat. §§ 44-1521;

M.      Arizona Sub-Class: Whether Plaintiffs and the Sub-Class are entitled to maximum statutory damages, costs and fees under Ariz. Rev. Stat. §§ 44-1521;

N.      Arizona Sub-Class: Whether Plaintiffs and the Sub-Class are entitled to injunctive relief under Ariz. Rev. Stat. §§ 44-1521;

O.      Florida Sub-Class: Whether the conduct of Defendants constitutes a deceptive, unfair, and unlawful trade act or practice in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1);

P.      Florida Sub-Class: Whether Plaintiffs and the Sub-Class Members are entitled to damages, injunctive relief and/or fees and costs under Fla. Stat. §§ 501.201, *et seq.*

Q.      Whether Defendants were negligent in their actions and/or omissions;

R.      Whether Defendants have been conferred an enrichment by keeping funds that they were obligated to replace pursuant to Regulation E's error resolution obligations; and

S.      Whether Plaintiff and the Class Members are entitled to injunctive relief.

151.   Typicality: Plaintiffs' claims are typical of those of other Class and Sub-Class Members because Plaintiffs were fraudulently induced by a third party to cause a withdrawal of funds from their Wells Fargo accounts to occur through the Wells

Fargo/Zelle mobile application. After disputing that unauthorized transaction, Plaintiffs were informed by Defendants that the unauthorized transactions would ultimately not be reversed.

152.   Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of Class and Sub-Class Members. Plaintiffs' Counsel are competent and experienced in litigating consumer class actions.

153.   Predominance: Defendants have engaged in a common course of conduct toward Plaintiffs, Class Members, and Sub-Class Members, in that all were induced into allowing a third party to make unauthorized withdrawals on their Wells Fargo accounts using Zelle. The common issues arising from Defendants' conduct affecting Class and Sub-Class Members set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

154.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class and Sub-Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class and Sub-Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class and Sub-Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

155.   Defendants have acted on grounds that apply generally to the Class and Sub-Classes, so that class certification is appropriate.

156.   All Members of the proposed Class and Sub-Classes are readily

ascertainable. Defendants have access to consumer reporting of fraudulent and/or unauthorized transactions on their books and records. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

157.   <u>Notice</u>: Plaintiffs anticipate providing direct notice to the Class and Sub-Classes for purposes of class certification, via U.S. Mail and/or email, based upon Defendants' and/or Defendants' agents' records.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA"), 15 U.S.C. §§ 1693, *ET SEQ.***

**(On Behalf of Plaintiffs, the Class Against All Defendants)**

158.   Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

159.   The Electronic Fund Transfer Act ("EFTA") and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(a).

160.   The primary objective of EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

161.   Financial institutions have error resolution obligations pursuant to Regulation E in the event that a consumer notifies the financial institution of an error. 12 C.F.R. § 1005.11.

162.   WFC and Wells Fargo Bank are financial institutions. 12 C.F.R. § 1005.2(i).

163.   Zelle is an MPP and financial institution, as the applicable code, 12 C.F.R. § 1005.2(i), is interpreted by the Consumer Financial Protection Bureau and the Federal Deposit Insurance Corporation, because it issues an access device and agrees with a consumer to provide electronic fund transfer services.[20]

---

[20] *Ibid.*

164.   "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

165.   After said investigation, the financial institution must determine whether an error has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. *Id.*

166.   A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) days after receipt of notice of error to investigate. *Id.* § 1693f(c).

167.   Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." *Id.* § 1693f(f).

168.   An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any P2P or mobile payment transactions that meet the definition of EFT. 12 C.R.F. 1005.3(b)(1)(v); *id.*, Comment 3(b)(1)-1ii.

169.   Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. 1005.2(m).

170.   According to the CFPB and FDIC, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.[21]

171.   In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under Regulation E.[22]

172.   Here, Plaintiffs, the Class Members, and Sub-Class Members were fraudulently induced by third-party scammers purporting to be Wells Fargo to share Zelle account information, personal information, login credentials and/or authorization codes.

173.   The third party then used the information fraudulently obtained from Plaintiffs, the Class Members, and Sub-Class Members to make unauthorized EFTs from the bank accounts of Plaintiffs and other Class Members.

174.   After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiffs, the Class Members, and Sub-Class Members .

175.   Plaintiffs, the Class Members, and Sub-Class Members notified Wells Fargo Bank and WFC of these errors within sixty (60) days of their appearances on the accounts of Plaintiffs and other Class Members.

176.   Wells Fargo Bank and WFC then issued provisional credits in the amounts of those credits on the account of Plaintiff Stock, and at least some of the other Class Members.

---

[21] *See supra*, notes 14, 15.
[22] *See supra,* note 14.

177.   After receiving notice of the unauthorized EFTs on the accounts of Plaintiff Stock, and other Class Members, Wells Fargo Bank, using a WFC-standardized letter, informed Plaintiffs and at least some of the Class members that the provisional credits placed on said accounts would be reversed because Wells Fargo Bank and WFC erroneously concluded that the unauthorized EFTs "were made by [Plaintiff and other class members] or someone who had [their] permission to perform transactions on [their] account."

178.   For Plaintiff Sioris, Plaintiff Hartsock, Plaintiff Winiarski and Plaintiff Vincent, Wells Fargo sent letters indicating that they had concluded their investigation and would not be refunding any of the money from the unauthorized transactions.

179.   While Wells Fargo Bank eventually refunded Plaintiff Stock $1,000, she was not refunded for the two $10 service fees incurred as a result.

180.   Wells Fargo notified Zelle of Plaintiffs' claims with Wells Fargo and of the unauthorized transactions.

181.   Plaintiff Vincent also notified Zelle of the unauthorized transactions on May 9, 2022.

182.   As a direct and proximate result of the conduct of Defendants, Plaintiffs, the Class Members, and Sub-Class Members were unable to reclaim funds that were fraudulently taken from their accounts with Wells Fargo within the authorized period for error resolution.

183.   Upon information and belief, Defendants knowingly and willfully failed to fulfill their obligations to investigate Plaintiffs' unauthorized transactions and instead summarily concluded that the transfers of funds via Zelle on accounts of Plaintiffs and other Class Members were not in error, when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

184.   Upon information and belief, Defendants intentionally determined that the unwanted transfer of funds via Zelle on accounts of Plaintiffs, the Class Members, and Sub-Class Members were not in error due to, at least in part, WFC's financial self-interest as a stakeholder in Zelle, and for both Wells Fargo and Zelle, to avoid their liability to Plaintiff and other Class Members for the unauthorized transfers pursuant to Regulation E.

185.   Defendants, in their normal course of business, refuse to completely reverse or refund funds (including any related service charges incurred because of the unauthorized charges), to consumers consistent with their obligations under Regulation E, §1005.6.   Notably, it was only after Plaintiff Stock and Plaintiff Hartsock separately filed a lawsuit that Wells Fargo reimbursed each of them for the unauthorized charges.

186.   As such, Plaintiffs, the Class Members, and Sub-Class Members are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Wells Fargo, WFC and Zelle; and (iv) reasonable attorneys' fees and costs. *Id.* §§ 1693f(e)(2), 1693m(a)(2)(B)-(3).

## SECOND CAUSE OF ACTION
## CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),
## CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*
## (On Behalf of Plaintiffs Stock and Sioris and the California Sub-Class Against All Defendants)

187.   Plaintiffs Stock and Sioris reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

188.   The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

189.   The UCL imposes strict liability. Plaintiffs Stock and Sioris need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

*"Unfair" Prong*

190.   A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

191.   Wells Fargo Bank and WFC's actions constitute "unfair" business practices because, as alleged above, they intentionally declined to reverse charges and refund associated fees on the accounts of Plaintiff Stock, Plaintiff Sioris, and California Sub-Class Members even though they knew or should have known that said charges were in fact unauthorized transactions that needed to be reversed pursuant to the terms of EFTA.

192.   Defendants' failure to adequately investigate the unauthorized transactions, including after acknowledging the Zelle scam in some instances, coupled with their financial interest in Zelle and the bank's decision to not permanently and completely credit their customers' accounts that were affected by the scam, offends established public policy, including that embodied by the EFTA.

193.   Through their practices, Wells Fargo Bank and WFC save millions of dollars which should have, in all fairness, been permanently credited to Plaintiff Stock, Plaintiff Sioris, and the California Sub-Class following their disputes with the bank.

194.   The harm to Plaintiff Stock, Plaintiff Sioris, and California Sub-Class Members grossly outweighs the utility of Defendants' practices as there is no utility to practices of Defendants.

//

//

### *"Unlawful" Prong*

195.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

196.   Wells Fargo Bank and WFC's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of EFTA as described in Plaintiffs' First Cause of Action above.

197.   The violation of any law constitutes as "unlawful" business practice under the UCL.

198.   These acts and practices alleged were intended to or did result in violations of EFTA.

199.   Defendants have and will continue to unlawfully deny the transaction disputes of Plaintiff Stock, Plaintiff Sioris, the California Sub-Class, and the public by claiming that said disputed transactions are "authorized," even though said transactions are actually "unauthorized," as that term is defined by EFTA and applicable regulations. Consequently, the practices of Defendants constitute unfair and unlawful business practices within the meaning of the UCL.

200.   Pursuant to the UCL, Plaintiff Stock, Plaintiff Sioris, and the California Sub-Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff Stock, Plaintiff Sioris, and the California Sub-Class of all the revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

//

//

//

//

//

//

**THIRD CAUSE OF ACTION**

**WASHINGTON CONSUMER PROTECTION ACT ("CPA"),**

**RCW § 19.86, *ET SEQ.***

**(On Behalf of Plaintiff Hartsock and the Washington Sub-Class Against All Defendants)**

201.   Plaintiff Hartsock realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

202.   Washington prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. RCW 19.86.20.

203.   Defendants' acts violate the EFTA, as described in Plaintiff Hartsock's First Cause of Action above.

204.   Defendants' acts or practices constitute unfair or deceptive business practices because, as alleged above, Defendants intentionally declined to timely reverse or to refund charges on the accounts of Plaintiff Hartsock and the Washington Sub-Class members even though they knew or should have known that said charges were in fact transactions not authorized by Plaintiff Hartsock and the Washington Sub-Class members, and Defendants are obligated to reverse or refund them pursuant to the EFTA.

205.   Defendants' acts or practices constitute an unfair or deceptive practice, where Defendants failed to adequately investigate the cause of unauthorized transactions because this would reveal the security limitations of the Wells Fargo and/or Zelle app and result in Defendants' liability for unauthorized transfers, which conflicts with WFC and Wells Fargo Bank's financial interests in Zelle. On information and belief, the manner that Wells Fargo Bank investigates, and processes, Zelle-related fraud claims differs from other similar investigations.

206.   Defendants' acts or practices constitute an unfair or deceptive practice where, with knowledge of a widespread scam affecting their customers, Defendants failed

to take reasonable steps to adequately warn of known risks and/or dangers associated with the Wells Fargo and/or Zelle app and to take appropriate steps in response to a known scam involving the app to protect consumers.

207.   Defendants' acts or practices constitute an unfair or deceptive practice where, with knowledge of a widespread scam affecting their customers, Defendants failed to take reasonable steps to develop and implement adequate safety precautions to mitigate against known, rampant Zelle app scams.

208.   Defendants' acts or practices occur in the conduct of trade or commerce.

209.   Defendants' acts or practices affect the public interest because there is a strong likelihood that additional consumers have been or will be injured in exactly the same fashion.

210.   Through their acts or practices, Defendants save themselves millions of dollars which should have been credited to Plaintiff Hartsock and the Washington Sub-Class members from their refusal to reverse or refund the unauthorized transactions.

211.   Plaintiff Hartsock and the Washington Sub-Class members are injured by Defendants' acts or practices by the failure to reverse or refund funds and to comply with Regulation E.

212.   Pursuant to the CPA, Plaintiff Hartsock and the Washington Sub-Class members are entitled to preliminary and permanent injunctive relief that Defendants must comply with Regulation E.

213.   Pursuant to the CPA, Plaintiff Hartsock and the Washington Sub-Class members are entitled to preliminary and permanent injunctive relief, and they seek an order requiring Defendants to cease their unfair and unlawful practice of failing to divulge to consumers and putative class members their unfair, anti-competitive business practices of profiting from Zelle at consumers' expense.

214.   Plaintiff Hartsock and the Washington Sub-Class members are also entitled to restitution, refund of funds unfairly obtained by Defendants, disgorgement, as well

as all costs, funds, and fees available at law to remedy with this unfair, anti-competitive acts or practices.

# FOURTH CAUSE OF ACTION

## VIOLATIONS OF ARIZONA CONSUMER FRAUD ACT ("ACFA"), ARIZ. REV. STAT. §§ 44-1521, *ET SEQ.*

### (On Behalf of Plaintiff Winiarski and the Arizona Sub-Class Against All Defendants)

215.   Plaintiff Winiarski realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

216.   The ACFA provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*Id.* § 44-1522.

217.   Plaintiff Winiarski and the Arizona Sub-Class Members are "persons" as defined by Ariz. Rev. Stat. § 44-1521(6).

218.   Defendants provide "services" as that term is included in the definition of "merchandise" under Ariz. Rev. Stat. § 44-1521(5) and Defendants are engaged in the "sale" of merchandise as defined by Ariz. Rev. Stat. § 44-1521(7).

219.   Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

A.    By Defendant Zelle advertising its money transfer services as "a fast, safe and easy way to send and receive money" that is superior to other forms of transferring money[23];

B.    By Defendant Wells Fargo advertising its mobile banking app services with Zelle as being "fast safe and easy way to send and receive money" that "protect[s]" consumers in the "unlikely event an unauthorized user accesses your consumers accounts and initiates payments using Wells Fargo Online or Wells Fargo Mobile"[24];

C. Failing to maintain sufficient security to keep Plaintiff and Sub-Class Member's confidential financial and personal data from being obtained by scammers;

D. Failing to disclose the Zelle scam to Arizona Sub-Class Members in a timely and accurate manner, in violation of Ariz. Rev. Stat. § 18-552(B);

E. Intentionally declining to reverse or to refund charges on the accounts of Plaintiff and Arizona Sub-Class Members even though they knew or should have known that said charges were in fact transactions not authorized by Plaintiff or the Arizona Sub-Class Members, and Defendants are obligated to reverse or refund them pursuant to EFTA.

F. Failing to adequately investigate the cause of unauthorized transactions because this would reveal the security limitations of the Wells Fargo/Zelle app and result in Defendants' liability for unauthorized transfers, which conflicts with WFC's financial interests in Zelle. On information and belief, the manner that Wells Fargo Bank investigates, and processes, Zelle-related fraud claims differs from other similar investigations.

---

[23] https://www.wellsfargo.com/online-banking/transfer-pay/comparison-chart/ (last visit July 6, 2022).
[24] https://www.wellsfargo.com/help/online-banking/zelle-faqs/ (last accessed July 6, 2022).

G. Failing to take reasonable steps to adequately warn of known risks and/or dangers associated with the Wells Fargo/Zelle app and to take appropriate steps in response to a known scam involving the app to protect consumers;

H. Failing to take reasonable steps to develop and implement adequate safety precautions to mitigate against known, rampant Zelle app scams.

220.  The above unlawful, unfair, and deceptive acts and practices by Defendants were immoral, unethical, oppressive and unscrupulous. These acts cause substantial injury to Plaintiff Winiarski and the Arizona Sub-Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

221.  As financial institutions, Defendants knew or should have known that their money transfer systems and security practices were inadequate to safeguard Arizona Sub-Class Members' bank accounts and that the risk of unauthorized transactions was high. Defendants' actions in engaging in the above-identified deceptive acts and practices were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of the Arizona Sub-Class Members.

222.  Defendants' acts or practices affect the public interest because there is a strong likelihood that additional consumers have been or will be injured in exactly the same fashion.

223.  Through their acts or practices, Defendants save themselves millions of dollars which should have been credited to Plaintiff and the Arizona Sub-Class from their refusal to reverse or refund the unauthorized transactions.

224.  As a direct and proximate result of Defendants' deceptive acts and practices, the Arizona Sub-Class Members suffered an ascertainable loss of money or property, real or personal, as described above and were injured by Defendants' acts or practices in failing to reverse or refund funds and to comply with Regulation E.

225.   Pursuant to Ariz. Rev. Stat. §§ 44-1521, Plaintiff Winiarski and the Arizona Sub-Class are entitled to preliminary and permanent injunctive relief that Defendants must comply with Regulation E.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRATICES ACT FLA. STAT. §§ 501.201, *ET SEQ.***
**(On Behalf of Plaintiff Vincent and the Florida Sub-Class Against All Defendants)**

226.   Plaintiff Vincent realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

227.   Plaintiff Vincent and the Florida Sub-Class Members are "consumer[s]" as defined by Fla. Stat. § 501.203.

228.   Defendants engaged in the conduct alleged in this Complaint, and advertised, offered or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida, including Plaintiff Vincent and Florida Sub-Class Members.

229.   Defendants engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

     A.     By Defendant Zelle advertising its money transfer services as "a fast, safe and easy way to send and receive money" that is superior to other forms of transferring money[25];

     B.     By Defendant Wells Fargo advertising its mobile banking app services with Zelle as being "fast safe and easy way to send and receive money" that "protect[s]" consumers in the "unlikely event an unauthorized user accesses

---

[25] *Ibid.*

your consumers accounts and initiates payments using Wells Fargo Online or Wells Fargo Mobile"[26];

C.      Failing to maintain sufficient security to keep Plaintiff and Sub-Class Member's confidential financial and personal data from being obtained by scammers;

D.      Intentionally declining to reverse or to refund charges on the accounts of Plaintiff and Sub-Class Members even though they knew or should have known that said charges were in fact transactions not authorized by Plaintiff or the Sub-Class Members, and Defendants are obligated to reverse or refund them pursuant to the EFTA.

E.      Failing to adequately investigate the cause of unauthorized transactions because this would reveal the security limitations of the Wells Fargo/Zelle app and result in Defendants' liability for unauthorized transfers, which conflicts with Wells Fargo's financial interests in Zelle. On information and belief, the manner that Wells Fargo investigates, and processes, Zelle-related fraud claims differs from other similar investigations.

F.      Failing to take reasonable steps to adequately warn of known risks and/or dangers associated with the Wells Fargo/Zelle app and to take appropriate steps in response to a known scam involving the app to protect consumers;

G.      Failing to take reasonable steps to develop and implement adequate safety precautions to mitigate against known, rampant Wells Fargo/Zelle app scams.

230.   These unfair acts and practices violated duties imposed by laws, including but not limited to EFTA.

231.   Defendants' misrepresentations were disseminated in Florida via the internet.

---

[26] *Ibid.*

232.   As a direct and proximate result of Defendants' violations of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff and the Florida Sub-Class Members suffered damages including, but not limited to an ascertainable loss of money or property, real or personal, as described above and were injured by Defendants' acts or practices in failing to reverse or refund funds and to comply with Regulation E's investigative and error resolution requirements.

233.   As a direct result of Defendants' knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff Vincent and the Florida Sub-Class Members are entitled to damages as well as injunctive relief, including but not limited to: ordering that Defendants must comply with Regulation E.

234.   Plaintiff Vincent brings this action on behalf of herself and Florida Sub-Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed decisions about the banking mobile app and money transfer services they use, and to protect Plaintiff, Florida Sub-Class Members and the public from Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Defendants' wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

235.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive and unscrupulous. These acts caused substantial injury to Plaintiff Vincent and Florida Sub-Class Members that they could not reasonably avoid; this substantial injury outweighed any benefit to consumers or to competition.

236.   As financial institutions, Defendants knew or should have known that their money transfer systems and security practices were inadequate to safeguard Sub-Class Members' bank accounts and that the risk of unauthorized transactions was high.

237. Defendants' actions or inactions in engaging in the above-identified unfair practices and deceptive acts herein were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of the Florida Sub-Class Members.

238. Defendants' acts or practices affect the public interest because there is a strong likelihood that additional consumers have been or will be injured in exactly the same fashion.

239. Through their acts or practices, Defendants save themselves thousands of dollars which should have been credited to Plaintiff and the Florida Sub-Class Members from their refusal to reverse or refund the unauthorized transactions.

240. Plaintiff and Florida Sub-Class Members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to damages, restitution, injunctive relief, and/or attorney fees and costs, and any other just and proper relief.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE
### (On Behalf of Plaintiffs, and All Sub-Classes Against All Defendants)

241. Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

242. Wells Fargo Bank and WFC owed Plaintiffs, and all Sub-Classes at least a duty to take reasonable steps to safeguard customer financial information and protect their financial accounts from malicious third parties, to adequately warn of known risks and/or dangers associated with the Wells Fargo/Zelle app, and to properly investigate disputed transactions initiated and consummated through the Wells Fargo and/or Zelle app.

243. Zelle owed Plaintiffs and all Sub-Classes at least a duty to take reasonable steps to adequately warn of known risks and/or dangers associated with the Wells

Fargo/Zelle app, and to take appropriate steps in response to a known scam involving the app to protect consumers from malicious third parties.

244.   Defendants breached their obligations to Plaintiffs, and all Sub-Class Members and were otherwise negligent and/or reckless by at least:

A.   Failing to maintain adequate data security measures to prevent or reduce the risk of disclosure of the names, phone numbers, and bank affiliation of Plaintiffs, and the Sub-Classes to malicious third parties;

B.   Failing to adequately protect the private information of Plaintiffs, and the Sub-Classes;

C.   Failing to properly warn Plaintiffs, and the Sub-Classes of the risks and/or dangers associated with the Wells Fargo/Zelle mobile app or informing consumers about the Zelle-related scams;

D.   Failing to review account agreements and disclosures to ensure they do not attempt to diminish or limit consumers' rights under Regulation E;

E.   Failing to take appropriate steps to avoid unauthorized transactions through the Wells Fargo/Zelle app in response to known scams and continuing with business as normal;

F.   Failing to adequately investigate and document findings from the investigations of fraud-related EFT disputes of the unauthorized transactions made on the accounts of Plaintiffs, and the Sub-Classes using the Wells Fargo/Zelle payment platform;

G.   Failing to implement appropriate and sufficient safeguards against scams of the nature alleged in the Complaint in light of the knowledge that those scams have been rampant across the country;

H.   Permitting scammers to use Zelle's member banks to siphon funds from accounts of Plaintiffs, and the Sub-Classes' accounts using the Wells Fargo/Zelle payment platform;

I.    Failing to reverse unauthorized transactions pursuant to Regulation E error resolution requirements following disputes of Plaintiffs, and the Sub-Classes despite Defendants' knowledge that the transactions were unauthorized as part of a scam that is well-known to Defendants; and

J.    Failing to permanently reverse or refund unauthorized transactions upon a sufficient showing by Plaintiffs, and the Sub-Classes that the transactions were unauthorized.

245.   As a direct and proximate result of Defendants' breaches, Plaintiffs, and the Sub-Classes lost funds from their Wells Fargo Bank accounts and incurred unnecessary related charges.

246.   Plaintiffs, the Sub-Classes are entitled to damages for their continuing and increased risk of fraud and their loss of money.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs, and All Sub-Classes Against
### WFC and Wells Fargo Bank)

247.   Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

248.   Defendants have been conferred the benefit or enrichment by keeping funds that Defendants are otherwise obligated to replace for Plaintiffs, and Sub-Class Members pursuant to Regulation E's error resolution obligations.

249.   Defendants know and appreciate this benefit or enrichment and the detriment or impoverishment to Plaintiffs, and Sub-Class members.

250.   It is inequitable for Defendants to retain the benefit or enrichment of keeping these funds when they know that as financial institutions, they are obligated to

comply with Regulation E and credit Plaintiffs and putative Sub-Class Members' accounts for the amounts taken.

251. Plaintiffs, and Sub-Class members have sustained a detriment or an impoverishment from Defendants' failure to remedy this inequity and are entitled to restitution for the unjust enrichment to Defendants.

252. Plaintiffs, and Sub-Class members are entitled to restitution and disgorgement of the funds unjustly retained by Defendants in the absence of any legal relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, and each of them, as follows:

- Class certification of this action;
- Appointment of Plaintiffs as Class Representatives;
- Appointment of Plaintiffs' attorneys as Class Counsel;
- An award of actual damages, in an amount to be determined at trial;
- An award of treble damages against Defendants pursuant to the EFTA;
- An award of the lesser of $500,000.00 or one percent (1%) of the net worth of Defendants;
- An award of the maximum allowable damages against Defendants pursuant to Cal. Bus. & Prof. Code § 17200, RCW § 19.86, Ariz. Rev. Stat. § 44-1521; and/or Fla. Stat. §§ 501.201, *et seq.*;
- Injunctive and other equitable relief against Defendants as necessary to protect the interests of Plaintiffs and other Class Members and Sub-Class Members, and an order prohibiting Defendants from engaging in unlawful and/or unfair acts described above, including public injunctive relief;
- Disgorgement;
- An order of restitution from Defendants for unjust enrichment;
- An order declaring Defendants' conduct as unlawful;
- Costs of Suit;

- Pre- and post-judgment interest;
- An award of reasonable attorneys' fees; and
- Any other relief the Court may deem just and proper, including interest.

### DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable.

Dated: July 11, 2022                            Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: /s/ Abbas Kazerounian
Abbas Kazerounian, Esq.

ATTORNEY FOR PLAINTIFF STOCK

**KELLER ROHRBACK L.L.P.**

By: /s/ *Laura R. Gerber*
By: /s/ *Nathan L. Nanfelt*

ATTORNEYS FOR PLAINTIFF HARTSOCK
AND PLAINTIFF WINIARSKI

**SAUDER |SCHELKOPF**

By: /s/ *Joseph G. Sauder*

ATTORNEY FOR TRACY VINCENT